FEDERAL TRADE
COMMISSION, Plaintiff,

v.

OVERSEAS UNLIMITED AGENCY,
INC.; Michael Bruce Marks; Susan
Roy Marks, Defendants.

George E. SCHULMAN,
Receiver–Appellee,

v.

WILSHIRE CENTER BANK,
Respondent–Appellant.

No. 88–6157.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 5, 1989.

Decided April 21, 1989.

Martin J. Spear, Baker & McKenzie, Los Angeles, Cal., for respondent-appellant.

Jay A. Woollacott, Jay A. Woollacott, A Law Corp., Wolfe & Linden, Los Angeles, Cal., for receiver-appellee.

Before WRIGHT, FARRIS and NELSON, Circuit Judges.

FARRIS, Circuit Judge:

Wilshire Center Bank appeals from an order directing it to surrender a bank account to George E. Schulman, the receiver for Overseas Unlimited Agency. The account consists of funds paid by Wilshire to Overseas in exchange for credit card drafts. By contract, Wilshire retained a right to make "charge backs" from the account if Overseas' customers refused to honor the drafts. Wilshire maintains that it is not obliged to surrender the account because it holds a security interest in the account under Kentucky law. Schulman argues that the district court's order is not appealable under 28 U.S.C. §§ 1292(a)(1) or 1292(a)(2). Schulman also argues that the bank lacks a security interest in the account, because the bank's purchase of the credit card drafts did not involve the extension of credit.

## FACTS

This case focuses on the contractual relationships established in a credit card financing arrangement involving four parties: (1) the credit card purchaser; (2) the merchant (Overseas); (3) the intermediary bank (Wilshire); and (4) the sponsoring or collecting bank (Citizen's Fidelity). In the typical credit card transaction, the purchaser gives the merchant a credit card draft in exchange for service or merchandise. The merchant sells the credit card draft to the intermediary bank for the face value of the

draft less a processing fee. The intermediary bank then sells the credit card draft to the sponsoring bank at face value less a processing fee. The sponsoring bank in turn collects payment for the credit card draft from the credit card purchaser.

All transactions in the "charge loop" are subject to rights of charge back which run the other way. In cases where a credit card customer is dissatisfied with goods or services purchased on credit, and in other situations prescribed by law, the credit card purchaser has recourse not against the merchant but against the sponsoring bank. The purchaser may refuse to pay the sponsoring bank. The sponsoring bank may make good its loss by charging it back to the intermediary bank, which in turn may pass the loss back to the merchant. The central issue is whether the right of charge back gives the intermediary bank a security interest in the funds which it paid the merchant in exchange for the credit card drafts.

The precise contractual relationship between Wilshire, the intermediary, and Overseas, the merchant, is defined by two documents: an undated "Bank Card Merchant Agreement," which the parties agree was executed around February 6, 1987; and a letter "Agreement" dated February 6, 1987. The Bank Card Merchant Agreement is a standard form agreement. It provides that Wilshire "shall *purchase* all Drafts, and will pay [Overseas] the total amount (less credits) of Drafts less a merchant discount of 2.85%." (Emphasis added). These purchases are subject to two pertinent conditions. First, the Agreement provides that Overseas "shall indemnify and hold [Wilshire] harmless from any claim relating to any Draft purchased by [Wilshire] interposed by way of defense, dispute, offset or counterclaim." Second, the Agreement provides:

> [Overseas] agrees to pay the face amount of any Draft purchased by [Wilshire] hereunder ... and [Wilshire] shall have the right at any time to charge [Overseas] or [Overseas'] account therefor without notice and to reassign such Draft(s) to [Overseas] under any circumstances where chargebacks are authorized by rules and regulations of MasterCard or Visa or any state or federal consumer protection statute ...

The Merchant Agreement states that it is to be interpreted under Kentucky law.

The letter agreement provides that "Overseas Unlimited will deposit *its* MasterCard & Visa drafts into an account at our Bank." (Emphasis added). The agreement further specifies that Overseas shall maintain balances of between $75,000 and $150,000 "for the purpose of covering any possible Charge Backs."

On May 6, 1988, the Federal Trade Commission filed an action against Overseas under Section 5 of the Federal Trade Commission Act. The FTC charged that Overseas had defrauded customers seeking jobs through Overseas' international employment agency business. After ex parte proceedings, on May 10, the district court issued a temporary restraining order freezing all assets of Overseas and appointing George Schulman as temporary receiver. On that same day, Schulman served Wilshire Bank with a copy of the TRO. On May 11, Schulman served Wilshire with a demand to turn over various checking accounts which Overseas held at the bank. Wilshire refused.

On May 18, Schulman moved for an order to show cause why Wilshire should not be held in contempt for disobeying the TRO. On May 20, Wilshire responded with a document entitled "Motion to Quash Temporary Restraining Order and for Leave to Set Off Charge Backs." The motion was grounded on the claim that the initial receivership order would deprive Wilshire of a secured interest in Overseas' checking accounts. The trial court's rejection of Wilshire's motion in open court on May 27 was recorded in an Order entered on June 16. The June 16 Order directed Wilshire to turn over all accounts requested by the receiver. Wilshire appeals from that Order. We dismiss the appeal for lack of jurisdiction.

## DISCUSSION

The June 16 Order did not finally resolve the parties' rights to Overseas' as-

sets, and is therefore not appealable as a final order under 28 U.S.C. § 1291. *See S.E.C. American Principals Holdings, Inc.*, 817 F.2d 1349, 1350 (9th Cir.1987). Wilshire argues that the Order is appealable under either 28 U.S.C. §§ 1292(a)(1) or 1292(a)(2). 28 U.S.C. § 1292(a)(1) gives the federal courts of appeal jurisdiction over appeals from interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court." 28 U.S.C. § 1292(a)(2) grants appellate jurisdiction over appeals from "[i]nterlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property."

 Since the June 16 Order did nothing more than direct that funds be turned over to a receiver, we lack jurisdiction. A simple "turnover" order made pursuant to a previously unappealed order appointing a receiver does not constitute an "injunction" within the meaning of 28 U.S.C. § 1292(a)(1). *Waylyn v. Casalduc*, 219 F.2d 888, 890 (1st Cir.1955). In *Waylyn*, the United States moved to foreclose a mortgage and to have a receiver appointed for rental properties held by the Waylyn Corporation. Waylyn did not appeal from the appointment of the receiver. Thereafter, the district court ordered Waylyn to turn over $9,900 in security deposits to the receiver. Waylyn appealed on the ground that the order constituted a mandatory injunction. The First Circuit disagreed, labeling the order "a mere administrative turnover direction." *Id.*

A turnover order likewise does not fall within section 1292(a)(2), since it is not (1) an order appointing a receiver, (2) an order refusing to wind up a receivership, or (3) an order refusing to accomplish the purposes of a receivership. *See American Principals*, 817 F.2d at 1350 ("The circuits have held that orders requiring that funds be turned over to a receiver are unappealable."); *United States v. Beasley*, 558 F.2d 1200, 1201 (5th Cir.1977); *United States v.*

*Chelsea Towers, Inc.*, 404 F.2d 329, 330 (3rd Cir.1968); *Wark v. Spinuzzi*, 376 F.2d 827 (5th Cir.1967). These cases "illustrate a policy of strict construction that has confined appeals to the three categories clearly specified in the statute." C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure* § 3925, at 92 (1977). *See also* 9 *Moore's Federal Practice* ¶ 110.19[2], at 208 (1986) (similar). The June 16 Order does not fall within any of the three categories listed in 28 U.S.C. § 1292(a)(2).

DISMISSED.